IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| CHARLES SHERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 06-608-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| T-MOBILE USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

William D. Stark
876 Welcome Way S.E., Suite 200
Salem, Oregon  97302

Dana L. Sullivan
McKanna Bishop Joffe & Sullivan LLP
1635 N.W. Johnson Street
Portland, Oregon  97209

     Attorneys for Plaintiff

Paul Buchanan
Dennis E. Westlind
Stoel Rives LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon  97204

       Attorneys for Defendant

KING, Judge:

Plaintiff Charles Sherman brings a claim under the Oregon Family Leave Act ("OFLA"), a common law wrongful discharge claim, and a claim under the Americans with Disabilities Act ("ADA") against defendant T-Mobile.  Before the court is defendant T-Mobile's Motion for Summary Judgment (#43).

## BACKGROUND

Sherman began working as a customer care representative for T-Mobile on July 14, 2003. He became eligible for OFLA leave on or around January 10, 2004.  When at work, Sherman was a good performer.

T-Mobile's absence policy at the Salem Call Center, where Sherman worked, required employees to notify their supervisor and Resource Planning ("RP"), a group responsible for scheduling Center staffing to meet customer call volume, of all "unplanned" absences before the beginning of their shift.

Under the absence policy, even if an employee notified his or her supervisor and RP of an "unplanned" absence before the beginning of his or her shift, four "unplanned" absences within a 6-month period could result in the employee's termination.  Plaintiff asserts that T-Mobile's policy emphasized that the progressive discipline steps for unplanned absences were

Page 2 - OPINION AND ORDER

"guidelines." A supervisor had discretion to deem an absence paid time off, even if an employee was unable to call in prior to the start of his scheduled shift. Under T-Mobile's attendance policy, two consecutive days of absences were treated as one "unplanned" absence.

In addition, under the absence policy, if an employee failed to notify the supervisor and RP before taking an "unplanned" absence–known as a "no call, no show"–immediate disciplinary action, including termination, could be taken, depending on the reason for the request, the employee's attendance history, and other circumstances.

During the time in question, T-Mobile's Employee Handbook explained T-Mobile's policies as they pertained to legally-protected leaves of absence and that in cases of "intermittent" leave, all time taken had to be reported to TOPS.[1] TOPS, which stands for Time Off Planning Systems, was T-Mobile's third-party leave administrator. Employees were required to report "intermittent leave" to TOPS so that TOPS could determine whether the absence was legally protected, whether it should be considered "unplanned" or not for purposes of the absence policy, and so that it could track the amount of approved leave taken. The Employee Handbook also advised employees that in instances where an employee exhausted all approved leave time and failed to return to work, T-Mobile "reserves the right to terminate employment." Decl. of Dana August-Sanchez Ex. 3 at 5.

On January 26, 2004, Sherman was issued a verbal warning for attendance, unrelated to the claims he brings. On January 28, 29, and 30, 2004,[2] Sherman was absent from work to care

---

[1]Non-leave-related absences, including approved vacation and other paid time off absences, did not have to be reported to TOPS.

[2]Sherman's notes reflect that he also missed January 27 due to a sick child, but T-Mobile's attendance record does not reflect this absence. Sherman Decl. Ex. 1 at 1; Confidential

Page 3 - OPINION AND ORDER

for a sick child.  On February 9, 2004, T-Mobile issued Sherman a written warning for his sick child absences, in violation of T-Mobile policy.  The written warning stated:

> On 1/28/04 you called in and said your kid's [sic] were sick and you would not be able to make it to work.  When we spoke on the phone I let you know that you would be going to a Written Warning. . . .  Then you also called in on 1/29 and 1/30/04.

August-Sanchez Dep. Ex. 5.  The warning demanded "immediate improvement on your attendance."  Id.  The Written Warning adversely affected Sherman's bonus eligibility.  At the time, Sherman did not know he was entitled to take leave under the OFLA to care for his sick child.  T-Mobile's Employee Handbook did not mention the OFLA, and Sherman "never saw information about OFLA posted anywhere in the call center."  Decl. of Charles Sherman ¶ 5.

T-Mobile reports that Dana August-Sanchez, Assistant Human Resources Manager, was not consulted about this Written Warning.

When Sherman requested medical leave due to a back condition on March 16, 2004, T-Mobile provided him with the necessary forms to apply for leave, a Leave of Absence Checklist which stated that Sherman had to report his legally protected leave time to TOPS, and a brochure from TOPS, which listed TOPS' toll-free number and which reiterated that employees were required to report intermittent leave to TOPS.

Sherman asserts, however, that the human resources representative asked him how he had heard about medical leave, and appeared to be concerned that he knew about it.

---

Sullivan Decl. Ex. 3 at 32-33.

Sherman understood that he had to timely advise TOPS of all leave-related absences. Sherman understood, however, based upon information provided to him by TOPS representatives, that a report of any absence was timely if made within 30 days.

Sherman's doctor certified him for intermittent medical leave of up to 10 days per month plus an additional 2-3 days per month for medical treatment. T-Mobile granted this request on April 2, 2004 with an effective date of March 17, 2004.

From March 17 to April 14, 2004, Sherman accumulated 18 full or partial days of absences. Sherman Decl. Ex. 1 at 2-3; Confidential Sullivan Decl. Ex. 3 at 35-40. August-Sanchez called Sherman by telephone and left voice mail messages on April 7 and 8, reminding Sherman to contact TOPS to report his absences and advise about any changes to his health condition so that he could be granted the necessary leave. T-Mobile claims Sherman did not contact TOPS to report or certify any of his unexcused absences after March 23, 2004. Sherman responds that prior to April 14, 2004, he reported his absences to TOPS.

Between April 14 and April 21, Sherman claims he was absent for an approved vacation. Sherman worked April 24, but stopped coming to work beginning April 25. Each of the days that he was scheduled to work, he called his supervisor and RP.

On or about May 6, 2004, managers proposed Sherman's termination, due in part to the Written Warning issued to Sherman on February 9, 2004. August-Sanchez denied the request.

August-Sanchez sent Sherman a letter dated May 12, 2004, which Sherman admits he received, (1) reminding him that he had been instructed to contact TOPS for any absences pertaining to his OFLA leave, (2) because he had been absent for more than 8 calendar days, encouraging him to seek approval for a full leave of absence, and (3) notifying him that if he did

not contact TOPS and her within seven days of the date of the letter–by May 19–his employment would be terminated.

Sherman, however, claims in his declaration that August-Sanchez called him on May 12, and according to him, she told him he could disregard the letter, and that his top priority should be contacting TOPS to report his absences after April 25, 2004, the period that he had been off work continuously. Sherman testifies in his declaration that August-Sanchez told him she was placing him on continuous leave because he had missed more than 8 days of work. He testifies that she "did not tell me during our conversation on May 12 that I needed to contact TOPS to initiate a request for a continuous leave of absence." Sherman Decl. ¶ 16. He also understood from his telephone conversation with her that he had until May 20 to provide the information to TOPS. He explained to her that he had not reported his absences to TOPS because he had difficulty obtaining information about the date he was off work due to a sick child, and a date when he was sick with the flu himself, as opposed to his back condition.

T-Mobile disputes that August-Sanchez told Sherman he could disregard her May 12 letter. During his deposition, Sherman remembered only that he was to "get[] my time in putted into TOPS. Aside from that, I don't remember." Sherman Dep. 74:7, Oct. 24, 2006. He also stated, "I remember one conversation saying that I was going to be on full LOA [leave of absence] pending. I had to get all my information into TOPS. I remember that part of the conversation, and that's all I remember." Id. at 76. After reviewing the May 12 letter, opposing counsel asked Sherman, "So did you understand that if you did not comply by reporting your leave of absences to TOPS that you would lose your job at T-Mobile?" Sherman responded, "I

did, but – again, I wasn't going to falsify any information with TOPS.  I was going to make sure it was accurate."  Id. at 97.

August-Sanchez provided Sherman with a list, dated May 13, 2004, of the absences he had not called into TOPS, pre-dating April 25, 2004, requesting that he report these absences to TOPS.  According to Sherman, during the May 12 telephone call, August-Sanchez told him to focus on reporting his absences after April 25, 2004.

As of May 19, 2004, Sherman had not reported his absences to TOPS nor had he initiated the application process for a full medical leave.

Between May 17 and 20, 2004, Sherman contacted work force management to determine the dates he and his daughter had the flu.  Work force management had coded all of the absences as LOA, meaning intermittent leave, even though Sherman remembers telling his supervisor via text message that two of the absences were for reasons other than his back.

On May 20, 2004, Sherman contacted TOPS.  Sherman explained that he was trying to straighten out exactly which absences were related to his intermittent leave and which two were for other reasons.  The TOPS representative assured Sherman, as other representatives had before, that he had 30 days from any given absence to enter the time with TOPS and that he still had time to report absences occurring after April 25, 2004.  On May 20, Sherman left a message for August-Sanchez explaining that he had not yet reported his absences to TOPS because he had not been able to determine the date that his absence was related to his sick child and he was trying to figure out which date it was, to ensure that he was not providing false information to TOPS.

Page 7 - OPINION AND ORDER

Sherman's employment was terminated effective May 21, 2004.

Two months following his termination, Sherman submitted a calendar, that he had created through text messages in his phone, in support of his claim for unemployment insurance benefits. The calendar identified May 5 as the date he was absent to care for his sick child.

Sherman asserts that individuals at all levels of management, including human resources personnel, were unaware of OFLA's requirements and ways in which OFLA differed from federal law. T-Mobile provided no training to managers on the subject and company policies did not address it. Training materials that were developed recommended actions that would violate family leave laws. First-line managers were instructed by human resources personnel that they should not offer information to employees regarding leave rights. They were told that, if an employee called in an absence, they should not note the reason. Managers were advised to refer employees to human resources regarding absences. The information provided by human resources was often incorrect or confusing. T-Mobile employed an incentive system whereby managers and human resources were motivated to minimize employee absenteeism, without consideration as to whether absences were statutorily protected. Bonuses paid to managers and human resources representatives were dependent in part upon the absence rate of employees for whom the manager was responsible.

T-Mobile argues this information is irrelevant because other managers' alleged ignorance of OFLA or the differences between the Oregon and federal law has no bearing on the reason Sherman was terminated. T-Mobile also takes issue with the statements, asserting that the evidence does not support them.

Page 8 - OPINION AND ORDER

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

Sherman alleges claims under the Oregon Family Leave Act ("OFLA"), a common law wrongful discharge claim, and a claim for disability discrimination under the ADA.

I.    OFLA Claims

In his Complaint, Sherman alleges that T-Mobile violated OFLA because T-Mobile (1) did not "follow through" and "provide the proper information and medical forms" to him after learning of his back pain; (2) unlawfully considered his absences in caring for his sick children in deciding to terminate his employment; (3) "creat[ed] and maintain[ed] confusing and onerous OFLA process for reporting and qualifying for OFLA;" and (4) terminated his employment in retaliation for his assertion of OFLA rights. Complaint ¶¶ 21, 22.

In his response to T-Mobile's Motion for Summary Judgment, Sherman refines his allegations. He first argues that T-Mobile denied him OFLA leave by disciplining him with the Written Warning for taking time off to care for a sick child in January. He also argues that T-

Page 9 - OPINION AND ORDER

Mobile considered his sick child absences in its decision to terminate him.  Finally, he reasserts his allegation that T-Mobile's confusing reporting process violates OFLA.[3]

A.    Discipline for Taking OFLA-Protected Sick Child Leave

Under the OFLA, an employee is entitled to twelve weeks of leave within a one-year period for several specified reasons, including to recover from a serious health condition and to care for a sick child.  ORS 659A.159; ORS 659A.162; OAR 839-009-0250.  The employee may take this leave on an intermittent basis.  ORS 659A.162(6).  The OFLA makes it an unlawful employment practice to deny family leave to an eligible employee.  ORS 659A.183.

This Court and others in the District of Oregon have observed that the OFLA does not provide a cause of action for retaliation, and that a BOLI regulation attempting to do so is beyond the authority delegated to the agency.  See  Stewart v. Sears, Roebuck & Co., No. CV-04-428-HU, 2005 WL 5142285, at *3-4 (D. Or. Apr. 15, 2005); Cameron v. T-Mobile USA, Inc., No. CV-04-272-KI, 2005 WL 1106370, at *3-4 (D. Or. Apr. 28, 2005); Loumena v. Les Schwab Tire Ctrs. of Portland, Inc., No. CV 02-856-KI, 2003 WL 23957142, at *6 (D. Or. Oct. 2, 2003); Mortensen v. PacifiCorp, No. CV 06-541-HU, 2007 WL 405873, at *16 (D. Or. Feb. 1, 2007); Ryman v. Sears, Roebuck & Co., No. CV 05-1106-BR, 2006 WL 1720534, at *6 (D. Or. June 19, 2006); cf. Yeager v. Providence Health System Oregon, 195 Or. App. 134, 138-39, 96 P.3d 862 (2004) (OFLA provides remedy for retaliatory discharge).

---

[3]To the extent these allegations are not reflected in his Complaint, he requests leave to amend.  T-Mobile does not demand an amendment, and had full opportunity to respond to the refined claims in its reply brief.  Accordingly, I conclude that no formal submission of an amended complaint is necessary.

In his response to T-Mobile's motion for summary judgment, in addition to arguing that these cases are wrong, Sherman argues that they are distinguishable on their facts because he is claiming <u>denial</u> of OFLA leave, not retaliation or interference.  Sherman argues that T-Mobile denied him OFLA leave by disciplining him with the Written Warning for taking time off to care for a sick child in January.  Sherman's theory is that "the company denied Sherman OFLA leave for these dates by disciplining him for not returning to work."  Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 13-14.  Sick child leave, he opines, is different from other kinds of leave in that a parent does not have an opportunity to request it in advance, thereby giving the employer the opportunity to deny the leave in advance.  Rather, the denial occurs when the employee is disciplined for having taken the sick child leave after the fact.  He also argues that T-Mobile unlawfully considered his sick child absences in its decision to terminate him, and that this too constitutes "denial" of leave.

T-Mobile replies that Sherman is attempting to characterize what is a retaliation or interference claim as a denial claim.  T-Mobile approved all of the leave Sherman sought and that his doctor certified–he wasn't "denied" leave.

I have previously rejected the argument that retaliation against an employee for taking OFLA leave or inquiring about OFLA leave is a form of denial of OFLA leave.  <u>Loumena</u>, No. CV 02-856-KI, 2003 WL 23957142, at * 6.  In that case, plaintiff submitted a letter from BOLI Commissioner Dan Gardner in support of plaintiff's opposition to defendant's motion for summary judgment.  I noted that the Commissioner "argues that retaliation against an employee for taking OFLA leave or inquiring about OFLA leave is a form of denial of the right to OFLA leave."  <u>Id.</u>; <u>see also</u> Docket No. #57.  Nevertheless, while I was "sympathetic to the

Page 11 - OPINION AND ORDER

Commissioner's policy argument," I concluded that I could not "fill the gap in the statute."  Id.

Similarly, although Sherman attempts to distinguish sick child leave from other kinds of leave, in

the end Sherman's theories are retaliation theories.[4]

I am not persuaded otherwise by the BOLI decision cited by Sherman.  In that decision,

BOLI opined,

> firing Complainant during the time she was incapacitated from work due to OFLA
> qualifying medical condition, and by using Complainant's previous OFLA
> qualifying absences from work as the reason for firing her, Respondent denied
> Complainant the 12 weeks of leave to which she was entitled, thereby violating
> *former* ORS 659.478 and committing an unlawful employment practice.

In the Matter of Magno-Humphries, Inc., Case No. 38-02, 22 (Dec. 1, 2005) (BOLI final order)
(attached to Decl. of Dana L. Sullivan Ex. 25).

It is true that the BOLI case upon which Sherman relies splits the two theories up–denial

and retaliation–and the portion he cites is actually in the "denial" section, not the "retaliation"

section, of the Order.  Accordingly, T-Mobile is incorrect in its assertion that BOLI relied on its

retaliation regulation previously rejected by this court.  BOLI, however, gives no rationale for

concluding that the employer's conduct constitutes denial of leave, or how the same conduct can

also be characterized as retaliation.

In sum, plaintiff's theory, that he was denied leave because he was disciplined for taking

time to care for his sick children and that T-Mobile counted those absences in deciding to

terminate him, fails.  T-Mobile is entitled to summary judgment on these claims.[5]

---

[4]For the same reason, I reject Sherman's argument that T-Mobile "denied" him leave
because he was terminated while he was on leave–he still had half of the 1,250 hours of OFLA
leave remaining.  He was not "denied" leave, but rather he was terminated while on leave.

[5]I note that the Oregon legislature has recently enacted an amendment to the statute,
making retaliation a cause of action, and making the amendment retroactive.  HB 2635-A, 74th

B.    Violation of OFLA's Notice Requirement

1.    Third-Party Leave Administrator

Sherman argues that T-Mobile violated the OFLA because it terminated Sherman's

employment for Sherman's failure to comply with an unlawful notice requirement.[6]  See In the

Matter of NES Companies LP, Case No. 21-02, 29, n.3 (Oct. 9, 2002) (BOLI final order)

(attached to Sullivan Decl. Ex. 26) (noting that company's notice policy cannot be "more onerous

than OFLA's 24 hour oral notice requirement").

The OFLA requires employees to give notice of the need to take OFLA leave.  An

employer may require an employee to give it 30 days written notice before beginning leave.  ORS

659A.165(1).  If the employee is unable to give 30 days notice, the employee is "encouraged to

give the employer as much advance notice as is practicable."  OAR 839-009-0250(2).  If an

employee is able to give advance notice, the employee must follow the employer's "known,

reasonable and customary procedures for requesting any kind of leave."  OAR 839-009-

0250(1)(a).  If the OFLA leave is unanticipated or emergency, an employee must give oral notice

within 24 hours of the commencement of the leave, and written notice within three days after

returning to work.  ORS 659A.165(3).  If proper notice is not given pursuant to the statute or the

_____

Leg., Reg. Sess. (Or. 2007).  However, the amendment does not become effective until January 1,
2008.  http://www.leg.state.or.us/07reg/pubs/enact.pdf.

    [6]Pursuant to ORS 659A.885 (1), "Any individual claiming to be aggrieved by an unlawful
practice specified in subsection (2) . . . may file a civil action in circuit court."  Subsection 2, in
turn, reads, "An action may be brought under subsection (1) of this section alleging a violation of
ORS 659A.150 to 659A.186," which is the entire OFLA.  ORS 659A.165 contains the notice
requirements.  In his Complaint, Sherman alleges that T-Mobile "violated OFLA" by "creating
and maintaining confusing and onerous OFLA processes for reporting and qualifying for OFLA."
Complaint at ¶ 22.

employer's policy, "the employee may be subject to disciplinary action under a uniformly applied policy or practice of the employer."  ORS 659A.165(4); OAR 839-009-0250(4)(a).

Here, Sherman argues, T-Mobile knew Sherman was suffering from a health condition keeping him from work, but rather than request medical certification, as it was authorized to do by statute, August-Sanchez insisted that Sherman report the absences to TOPS.  When Sherman did not do so, T-Mobile terminated his employment.  Sherman points out that after BOLI's investigation of his case, the agency concluded that T-Mobile "violated the job protection provisions of OFLA by imposing more onerous notice requirements on Complainant and terminating him for his failure to comply."  BOLI Determination, Sullivan Decl., Ex. 24 at 5.  Sherman argues that this determination at least creates an issue of fact.  See Gifford v. Atchison, Topeka & Santa Fe RR Co., 685 F.2d 1149, 1156 (9th Cir. 1982) (EEOC "reasonable cause" determination on issue of disparate treatment created an issue of fact).

T-Mobile argues there was nothing confusing or onerous about August-Sanchez's direction to Sherman to report his leave-protected absences to TOPS.  Immediately upon his request for leave, August-Sanchez gave him TOPS' brochure, with its toll-free number, and explained the notification requirements.  Sherman said he understood those requirements.  Sherman started reporting his leave-related absences to TOPS, demonstrating that he knew how to do it.  After Sherman had been absent a number of days, August-Sanchez contacted him twice, telling him to report his absences, prepared a list of absences for him, and told him, both orally and in writing, that if he did not report his absences within seven days he would lose his job.

T-Mobile also argues the requirement to call his supervisor, RP and TOPS is not a *per se* violation of OFLA.  The three phone calls were necessary so that T-Mobile could plan around

Sherman's absences, and so that TOPS could properly track and approve Sherman's leave.  He did not comply with August-Sanchez's clear oral and written statement that he was to report his absences to TOPS by May 19.  T-Mobile contends that federal courts have consistently permitted an employer to require employees to comply with an employer's uniform notice requirement under the FMLA.

I find that the BOLI determination of substantial evidence alone is not enough to defeat summary judgment.  See Mondero v. Salt River Project, 400 F.3d 1207, 1215 (9th Cir. 2005) (EEOC determination of reasonable cause to believe employer discriminated on basis of sex is "not a free pass through summary judgment"); Sleigh v. Jenny Craig Weight Loss Centres, Inc., 161 Or. App. 262, 266-67, 984 P.2d 891 (1999) (such a determination is merely a "preliminary conclusion that sufficient grounds exist[]" for continuation of proceedings).  This is particularly true where, as here, plaintiff is asking that I accept a legal conclusion made by BOLI–that T-Mobile's call-in policy is more onerous than OFLA allows.

Nevertheless, I find that Sherman raises sufficient material issues of fact to survive T-Mobile's summary judgment.  The crux of the issue is whether Sherman could have given advance notice.  The record reflects that although he called his supervisor every time he was out, he rarely called his supervisor in advance of his shift.  For example, on April 26, 2004, he called his supervisor 59 minutes into his shift, 35 minutes into his shift on April 27, and on May 1 he called 4 hours into his shift.  Confidential Sullivan Decl. Ex. 3 at 42-43.  Accordingly, I cannot accept T-Mobile's assertion that simply because he called his supervisor at some point during his shift, Sherman was capable of calling his employer in *advance of his shift.*

This disputed question of fact is important because if Sherman could have given advance notice, he was required to comply with T-Mobile's "known, reasonable and customary procedures for requesting any kind of leave," which would include calling TOPS.  OAR 839-009-0250(1)(a).  If not, T-Mobile cannot impose a notice requirement on its employees that is more stringent than the OFLA requires.

I come to this conclusion after reviewing the statutes, the regulations, and relevant cases. The statute does not speak to whether employers may adopt policies and procedures requiring employees to give notice in any specific fashion.  As I summarize above, BOLI has adopted regulations requiring employees to follow the employer's "known, reasonable and customary procedures for requesting any kind of leave" if they are able to "give advance notice."  OAR 839-009-0250(a).  In contrast, in an unanticipated situation, an employee need only give verbal or written notice within 24 hours of beginning leave, and the notice can be provided by someone else on behalf of the employee.  OAR 839-009-0250 (3).  Thus, the OFLA imposes vastly different obligations on employees in situations where they take leave in an unanticipated situation.

While BOLI has interpreted its own regulations to allow an employer to require an employee to comply with its notice policy, even in the case of an unanticipated or emergency absence, it may only do so if the policy is not "more onerous than OFLA's 24 hour oral notice requirement."  In the Matter of NES Companies LP, Case No. 21-02, 29, n.3 (Oct. 9, 2002) (BOLI final order) (attached to Sullivan Decl. Ex. 26).  That decision accepted an employer's absence policy which allowed the employer to terminate an employee who had been absent more

Page 16 - OPINION AND ORDER

than three days without calling his employer–a time frame more lenient than imposed by the OFLA.

It is tempting to conclude that because the OFLA speaks only to when and how employees must notify their employers, not to whom, T-Mobile's policy is acceptable because it does not impose stricter time limits or methods on employees. The purpose, however, of the notice requirement is to ensure the *employer* is aware of the need for OFLA leave. Here, T-Mobile knew Sherman was suffering from a serious medical injury. August-Sanchez even placed Sherman on leave pending further information. Once the employee has invoked the protections of the OFLA, by notifying the employer within 24 hours of the unanticipated absence, it is the employer's obligation to confirm that the absence qualifies under the Act. See Cavin v. Honda of America Mfg., Inc., 346 F.3d 713, 726 (6th Cir. 2003). It may do this by requesting medical certification. 659A.168; OAR 839-009-0260. Alternatively, in this case, August-Sanchez could have called TOPS and informed it of her belief that Sherman's absence qualified for leave protection. TOPS, as the leave administrator, would then have the obligation of confirming whether or not the absence qualified. If Sherman's ailment was not one about which he could give advance notice, demanding that he give more notice than is required by the statute is a violation of the OFLA.

If Sherman was capable of giving advance notice, I conclude that, under these facts, T-Mobile's policy was reasonable and customary, but not necessarily known. The policy was reasonable because Sherman offers no evidence that making the phone call was a hardship on him, or that he was physically or mentally incapable of complying. It is also customary for companies like T-Mobile to outsource their leave administration to another company. Employer

Page 17 - OPINION AND ORDER

Tip:  Outsourcing FMLA Administration, 13 No. 12 Fam. & Med. Leave Handbook Newsl. 10

(Mar. 2006) ("Large employers often outsource the administration of employment laws").

Indeed, I am persuaded by the Sixth Circuit's conclusion that "it is both appropriate and

efficient for [the employer] to delegate the management of all FMLA claims to one

department[.]"  Cavin, 346 F.3d  at 725.  The Sixth Circuit cited the underlying district court's

decision which recognized, "[T]he goals of the FMLA are more likely to be met when a large

company coordinates FMLA leave through one department that is familiar with the FMLA and

its accompanying rules and regulations.  The FMLA is designed to provide job security to

employees, but the employees' needs must be balanced with the legitimate interests of the

employers."  Cavin v. Honda of America Mfg., Inc., No. C2-00-400, 2002 WL 484521, at *14

(S.D. Ohio Feb. 22, 2002).  Coordinating FMLA through a third-party company, whose sole job

is to approve and track leave, is similarly "appropriate and efficient."

Whether Sherman knew about T-Mobile's policy is a closer question.  There is no dispute

that Sherman was aware of his duty to call TOPS, but Sherman submitted a declaration stating

that he understood from TOPS, on a number of occasions, that he had 30 days within which to

report absences.  In his declaration, he also stated he thought August-Sanchez had placed him on

continuous leave, and that he should focus on reporting certain later absences, not earlier ones,

and that he should disregard the May 12th letter she sent him giving him a deadline by which to

report his absences to TOPS or risk being terminated.

In his deposition, however, he testified that he could not remember the whole May 12th

conversation with August-Sanchez, but that he remembered the "key thing" "had to do with

getting my time inputted into TOPS."  Sherman Dep. 74:10-17.  When asked whether he

remembered if August-Sanchez told him he needed to report his time to TOPS or he would be terminated, he responded, "I remember that being part of her conversation at one point." Id. at 74:25-75:4.  He also remembered that he was "going to be on full [Leave of Absence], pending. I had to get all my information into TOPS." Id. at 76:11-14.  He acknowledges receiving the May 12th letter from August-Sanchez.  He acknowledges reading it.  He states that he was concerned about accurately reporting information to TOPS, and that was the reason he did not report his absences.

In contrast to his declaration testimony about his disability, described below, any differences between Sherman's declaration and his deposition can fairly be characterized as an honest discrepancy or a mistake.  When reading the deposition, I can see how Sherman would have failed to mention some of the facts he states in his declaration since he was questioned first about his telephone conversation with August-Sanchez, and then about the contents of the letter. With his memory jogged about the letter, he was not asked again about the telephone conversation.   Furthermore, Sherman never gave directly contradictory answers to any questions. As a result, I reject T-Mobile's request and I do not disregard Sherman's statements related to this claim.

Viewing the facts in the light most favorable to Sherman, then, the question remains whether Sherman was capable of giving advance notice.  If he was, he was required to give notice to TOPS, following T-Mobile's "known, reasonable and customary" policy.  While the policy, under these facts, is reasonable and customary, because I accept Sherman's declaration, I find there is a material issue of fact as to whether T-Mobile's policy was "known" to him.

Page 19 - OPINION AND ORDER

Accordingly, viewing the facts in the light most favorable to plaintiff, I find there are

material issues of fact precluding granting summary judgment as to whether T-Mobile violated

the OFLA when it terminated Sherman for failing to comply with the company's notice policy.

2.    Posting OFLA Notice

Sherman argues that T-Mobile failed to post notice regarding OFLA or advise employees

of their rights and obligations under OFLA.  OFLA requires that employers display the Bureau of

Labor and Industries Family Leave Act notice in an area "that is accessible to and regularly

frequented by employees."  OAR 839-009-0300; see also ORS 659A.180.  Failure to do so

constitutes an unlawful employment practice.  Id.

T-Mobile replies that whether or not the posting requirements were met (it argues they

were), it can still discipline Sherman if he knew he had to report his absences to TOPS.

With respect to his termination for failing to report to TOPS, as I conclude above, there is

a material issue of fact as to whether Sherman knew what and when he had to report to TOPS.

Accordingly, the question remains whether T-Mobile could properly discipline Sherman for

failing to comply with its procedures.  See OAR 839-009-0250(4)(b) ("An employer may not

reduce an employee's available OFLA leave or take disciplinary action unless the employer has

posted the required [BOLI ]Family Leave Act notice or the employer can otherwise establish that

the employee had actual knowledge of the notice requirement").

In addition, at oral argument, Sherman argued that at the time he received the February 9,

2004 Written Warning, no notice had been posted, and he had no actual notice that he had a right

to take leave to care for his sick children.  He argued that T-Mobile's failure to post notice

constitutes a violation of OFLA in and of itself.  Sherman did not assert such a claim in his

Complaint, and did not make such an argument in his response to defendant's Motion for

Summary Judgment.[7]  Since discovery deadlines have passed, and a trial date is looming, I

conclude that Sherman has waived this claim.

II.    Wrongful Discharge

T-Mobile asserts that it is entitled to summary judgment on Sherman's wrongful

discharge claim.[8]  It argues that there is no causal connection between Sherman's termination and

his OFLA-protected absences.  It was only after he had numerous unexcused absences, because

he neglected to report to TOPS, that his employment was terminated.

Absent a contractual, statutory, or constitutional requirement, the general rule is that an

employer may discharge an employee at any time and for any reason.  Babick v. Oregon Arena

Corp., 333 Or. 401, 407 n.2, 40 P.3d 1059 (2002).  Two exceptions exist.  The first is when an

employee is discharged for fulfilling an important public duty.  Nees v. Hocks, 272 Or. 210, 536

P.2d 512 (1975) (employee discharged for serving on jury duty); Delaney v. Taco Time Intl, 297

Or. 10, 681 P.2d 114 (1984) (discharged for refusing to sign a false and arguably tortious

statement).  The second is when the plaintiff is discharged for exercising a job-related right that

---

[7]Rather, Sherman argued that T-Mobile's "failure to post a notice regarding OFLA . . . would preclude T-Mobile from taking disciplinary action against Sherman for failing to *notify TOPS of protected absences*," not for taking sick child leave.  Pl.'s Mem. in Opp. at 19 (emphasis added).

[8]T-Mobile also argues that plaintiff's wrongful discharge claim must be dismissed by virtue of the fact that he has no claim under OFLA.  However, I reject T-Mobile's argument in reliance on the analysis in Dunn v. CSK Auto, Inc., No. CV-05-116-HU, 2006 WL 1491444 (D. Or. May 22, 2006) ("[W]hile plaintiff may not have had a viable OFLA claim directly under OFLA, she is entitled to pursue her wrongful discharge claim at trial based on a theory that defendant terminated her because of her actions on January 1, 2004, in invoking, in good faith, what she believed to be her OFLA right to time off").

reflects an important public policy.  Brown v. Transcon Lines, 284 Or. 597, 588 P.2d 1087

(1978) (discharged for filing a workers compensation claim but statutory remedy in place at the

time was inadequate).  The Oregon Court of Appeals has allowed a wrongful discharge claim

based on retaliation for invoking OFLA rights.  Yeager v. Providence Health System Oregon,

195 Or. App. 134, 142-43, 96 P.3d 862 (2004).

       In a wrongful discharge claim, the employee must establish a "causal connection between

a protected activity and the discharge."  Estes v. Lewis and Clark College, 152 Or. App. 372,

381, 954 P.2d 792 (1998).  The employee's protected activity must have been a "substantial

factor" in the decision to terminate the employee.  Id.  In other words, the employer's wrongful

purpose must have been a "'factor that made a difference'" in the discharge decision."  Id.

(quoting Nelson v. Emerald People's Utility Dist., 116 Or. App. 366, 373, 840 P.2d 1384 (1992),

aff'd in part, rev'd in part, 318 Or. 99, 862 P.2d, 1293 (1993)).

       Sherman asserts there is record evidence suggesting that T-Mobile considered his January

absences in its eventual decision to terminate his employment.  The progressive discipline

process does not provide for termination without first a coaching discussion, then a documented

verbal warning, and finally a written warning.  The form T-Mobile submitted to the Oregon

Employment Department listed the February 9 Written Warning, which, it turns out, was

unlawfully issued as it was based on absences to care for sick kids.  Similarly, the termination

recommendation, which August-Sanchez denied, listed the February 9 Written Warning.

       Sherman also argues that although August-Sanchez denies that the sick child-related

absences played any role in the decision to terminate Sherman's employment, past attendance is

usually considered by T-Mobile in determining whether an employee should be terminated for

Page 22 - OPINION AND ORDER

absences.  In addition, Sherman argues that August-Sanchez's credibility has been called into question by significant contradictions between information she submitted to BOLI and what has since become known.  For example, T-Mobile reported that when Sherman called in his absences on January 29 and 30, he "did not state that those absences were related in any way to his children."  Sherman CSMF ¶ 7.  T-Mobile's records, however, show that Sherman's absences on those days were due to a sick child.  Furthermore, in her declaration to BOLI, August-Sanchez indicated that the May 6 termination request was the first knowledge T-Mobile had that Sherman had used intermittent leave since it was approved in March, but she clarified in her deposition that it was actually the first notice Human Resources had received.

T-Mobile argues that even if Sherman had been "discharged" as opposed to voluntarily separating after failing to come to work for several weeks and failing to apply for a full leave, Sherman is unable to show that his sick child absences in January were a "substantial factor"–a "factor that made a difference"–in the decision to discharge him.  Estes, 152 Or. App. at 381.  T-Mobile argues there is no evidence that his January absence played any role in his termination. T-Mobile asserts that his employment ended after Sherman (1) had been absent over 30 times between March and May, even surpassing the number recommended by his doctor; (2) had been informed, when he sought leave, what his reporting obligations were; (3) had been reminded again in April that he needed to report and needed to apply for a continuous leave if his medical condition had worsened; (4) had been instructed by phone and by letter that he would be terminated if he did not report and qualify his absences; and (5) did not report or qualify his absences.

T-Mobile points out that the supervisor who issued the warning in January had no involvement in the termination decision. In addition, August-Sanchez testified that she did not consider the January absences in her decision to terminate Sherman. Finally, the May 6 request from Sherman's managers to terminate him, which Sherman believes was based in part on his January sick child absences, was specifically rejected by August-Sanchez. She testified, "[W]e were not going to terminate [Sherman] for what the manager and supervisor wanted to terminate him for." August-Sanchez Dep. 43:25-33:2. Instead, August-Sanchez gave Sherman more time to properly qualify his absences.

Viewing the facts in the light most favorable to plaintiff, I conclude that, although it is extremely close, an issue of fact remains as to whether T-Mobile considered OFLA-protected absences in its decision to terminate Sherman. The May 6 recommendation that Sherman be terminated was based in part on the February 9 Written Warning and although August-Sanchez rejected that May 6 request, plaintiff has offered evidence challenging the credibility of August-Sanchez. In addition, past attendance is a factor considered in T-Mobile's policy when evaluating whether an employee should be terminated. T-Mobile may have been motivated by Sherman's having taken OFLA-protected leave when it terminated him. Accordingly, T-Mobile's motion for summary judgment on Sherman's wrongful discharge claim is denied.

III.    Claim under the ADA

T-Mobile seeks summary judgment on Sherman's claim under the ADA. In that claim, Sherman alleges he has a "serious health condition" that affects his ability to sleep, work and move. Complaint ¶ 31. Sherman claims T-Mobile failed to accommodate his disability and that his condition was a substantial motivating factor in his dismissal.

Page 24 - OPINION AND ORDER

To establish a prima facie case under the ADA, a plaintiff must show he is "a qualified individual with a disability who suffered an adverse employment action because of his disability." Sanders v. Arneson Prods., Inc., 91 F.3d 1351, 1353 (9th Cir. 1996).

As relevant here, an individual is disabled under the Act if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(a). "Substantially limits" is defined to mean:

(I) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Examples of major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I).

According to T-Mobile, Sherman does not come close to qualifying as disabled under the ADA. Regarding his disability, Sherman testified as follows:

Q:    How did having that [back] condition affect your day-to-day activities?

A:    Say if you're sitting down typing at a typewriter typing in memos, and your arm suddenly stops, you're now typing one-handed.

Q:    Okay.

A:    That would be one. Pain would be another from time to time. I'm not sure, I mean, what all's you're looking for.

Q:    . . . I just want to know how that [back condition] affected your ability to go through your life from day to day and do the things that you would otherwise like to do.

Page 25 - OPINION AND ORDER

A.    It's a hindrance.  I'll give you that.

Q:    Okay.  Did it ever prevent you from doing anything that you would have done otherwise?

A:    Typing twice as fast, for instance, because I can only use one hand.

Q:    Sure.  That's one example.  Do you have any more?

A:    I'm not sure exactly where to go with that one.

Q:    Okay.  Well, I'm asking, did the back condition and what you were experiencing with it prevent you from doing anything that you would have done had you not had that condition?  And right now you have told me typing.  Is there anything else?

A:    I mean definitely typing was one of the problems.  You know, for that matter, driving could be a problem sometimes.

Q:    How would driving be a problem?

A:    Sometimes it can make me feel like my left shoulder, because I drive left-handed, is going to blow up.  It's just going to come apart.

Q:    Did the condition ever prevent you from driving at all?

A:    There's times it's made me alter the way I did it, for sure.

Q:    How would you alter how you did it?

A:    Drive with my right hand.

. . .

Q:    For your job at T-Mobile, did the – did the symptoms you were experiencing ever prevent you from doing your job?

A:    For short times.

Q:    And when you say, short times, how long of a time do you mean?

A:    I mean I may be having a hard time today, and I have a hard time for a couple days.  I may have a hard time for only an hour or two at times.

Page 26 - OPINION AND ORDER

Q:      If you were having a hard time, does that mean you could still do your job but you had to do it differently, or does it mean that you couldn't do it at all?

A:      Sometimes it meant both.  If I have been up all night because I have been hurting and up all the day before.  It makes it kind of difficult to perform all your duties. . . .

. . .

Q:      Now, you mentioned that sometimes you would be up all night, not able to sleep; correct?

A:      Right.

Q:      How often would your shoulder and arm pain affect your ability to sleep?

A:      You know, it still does.  It's not something that I get a lot of forewarning on, and it's not something that really comes on every day.

Q:      Okay.

A:      So that's kind of an unfair question.

Q:      Okay.  I'm just trying to get a sense of during the time you worked at T-Mobile, did you have difficulty sleeping every night?

A:      No.

Q:      Okay.  Did you have difficulty sleeping maybe once a month, once a week?

A:      Sometimes.

Q:      Okay.

A:      Sometimes I had difficulty sleeping two or three nights a week.  Sometimes.  I don't know how to – I can't pinpoint it for you.  I'm sorry.

. . .

Q:      Is there anything that you just can't do at all?

Page 27 - OPINION AND ORDER

A:     I wouldn't say that there's nothing I can't do.  At least I haven't faced that
        challenge yet.

        . . .

Q:     Besides typing, did the arm condition affect your ability to do your job in
        any other way?

A:     Other than hurting from time to time, I have to say probably not.

Q:     So pain and having to type with one hand are the two effects that you can
        think of?

A:     Two major effects.

Q:     Can you think of any others?

A:     Not off the top of my head.

Q:     Is there anything that T-Mobile could have done that would have helped
        you do your job despite your condition?

A:     Lent me an extra arm.

Sherman Depo. 120-128.  T-Mobile argues these statements undermine Sherman's claim of

disability.

        I agree with T-Mobile and find that Sherman fails to raise a material issue of fact as to

whether his impairment, as he described it in his deposition, substantially limits a major life

activity.  In his deposition testimony, Sherman essentially complained of three problems:  typing,

sleeping and driving.  A limitation on continuous typing, standing alone, does not rise to the level

of a disability.  Thornton v. McClatchy Newspapers Inc., 292 F.3d 1045, 1046 (9th Cir. 2002).

        Even considering his typing limitation together with his other two limitations, I am not

persuaded that Sherman is "significantly restricted as to the condition, manner or duration" in

Page 28 - OPINION AND ORDER

performing a major life activity.  29 C.F.R. § 1630.2(j)(1).  For example, Sherman testified that

he sometimes had trouble sleeping two or three times a week.  The Second Circuit opined,

though, that "[d]ifficulty sleeping is extremely widespread.  [Plaintiff] made no showing that his

affliction is any worse than is suffered by a large portion of the nation's adult population."

Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 644 (2d Cir. 1998).  Similarly, Sherman

failed to testify how his occasional difficulty with sleep two or three times a week constituted a

substantial limitation.  Furthermore, as T-Mobile points out, Sherman testified that he attempts to

stay away from medication that could treat his pain and sleeplessness, so it is impossible to

determine whether his impairment could be corrected.  Sherman Dep. 126:7-9 ("I try to stay away

from the medication as much as I can, so unless I absolutely have to have it, I don't take it."); see

Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999) ("A person whose physical or

mental impairment is corrected by medication or other measures does not have an impairment

that presently 'substantially limits' a major life activity").

        Finally, with regard to his limitation on driving, Sherman admitted he needed only to

drive with his right hand to overcome any problems he experienced while driving.  This

limitation is not a significant restriction as to the "condition, manner or duration" in performing a

major life activity.

        Sherman relies on his declaration, arguing that because of his back condition he had

trouble sleeping, performing manual tasks such as gripping, lifting objects and turning his head,

thinking (due to his medication), sitting for extended periods, driving, and caring for his toddler.

T-Mobile contends that I should disregard the declaration as it contains new limitations that Sherman neglected to mention in his deposition. Because T-Mobile makes these arguments in its reply memorandum, Sherman did not have the opportunity to respond.

Given the great disparity between Sherman's deposition testimony and his declaration, and without any apparent reason for the disparity, I cannot accept his declaration testimony on this issue. T-Mobile's attorneys asked Sherman no less than six times, in an open-ended and fair way, how his back condition affected him during his deposition. Sherman never once mentioned caring for his child, sitting, turning his head, gripping, or having problems thinking due to his medication. These omissions cannot fairly be characterized as minor inconsistencies that are the result of an honest discrepancy, a mistake, or newly discovered evidence. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991). I conclude that the contradictions make the declaration a "sham," created for the purpose of generating a material issue of fact to preclude summary judgment, and I disregard the portion of Sherman's declaration in which he describes his limitations.

In sum, on the basis of Sherman's deposition testimony, I find that Sherman fails to raise a material issue of fact meeting the first factor of the prima facie case under the ADA: that he is a disabled person within the meaning of the statute. Accordingly, T-Mobile is entitled to judgment on this claim.

**CONCLUSION**

For the foregoing reasons, I grant in part and deny in part defendant's Motion for

Summary Judgment (#43).  T-Mobile is granted judgment on plaintiff's ADA claim, and portions

of plaintiff's OFLA claim, but is denied judgment on plaintiff's wrongful discharge claim and his

claim that T-Mobile's notice requirement violates the OFLA.

IT IS SO ORDERED.

Dated this _____6th_____ day of August, 2007.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge